QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Dominic Surprenant (Bar No. 165861)
  A. Brooks Gresham (Bar No. 155954)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Rachel M. Herrick (Bar No. 191060)
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: (415) 875-6600
Fax: (415) 875-6700

Attorneys for Defendant
Nextel Communications, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMEEN WILLIAM TOOMEY JUNIOR, | CASE NO. C 03 2887 MMC (JL) |
| Plaintiff, | Date: September 17, 2004<br>Time: 9:00 a.m.<br>Ctrm: 7, 19th floor<br>Judge: Hon. Maxine M. Chesney |
| v. | |
| NEXTEL COMMUNICATIONS, INC., | |
| Defendant. | **MOTION TO EXCLUDE THE EXPERT DAMAGES REPORT, CALCULATIONS AND TESTIMONY OF PLAINTIFF'S EXPERT LAWRENCE HARTE** |

Nextel Communications, Inc. ("Nextel") respectfully submits this memorandum in support of its motion to exclude the expert damages testimony of plaintiff's expert, Mr. Lawrence Harte, in its entirety.

**TABLE OF CONTENTS**

Page

Preliminary Statement .................................................... 1

Statement of Facts ....................................................... 2

    A.    Harte's Qualifications As An Expert ............................... 2

    B.    Harte's Damages Calculations ..................................... 3

Argument ................................................................ 4

I.    THE COURT'S GATEKEEPER FUNCTION AS TO EXPERT TESTIMONY UNDER *DAUBERT* AND *KUMHO TIRE*. ........................................ 4

II.   HARTE'S DAMAGES ANALYSIS ARE INADMISSIBLE BECAUSE HE IS NOT QUALIFIED TO PERFORM SUCH ANALYSIS. ............................. 5

III.  EACH OF THE CATEGORIES OF DAMAGES THAT HARTE CALCULATED ARE INADMISSIBLE UNDER *DAUBERT* AND *KUMHO TIRE*. .................. 8

    A.    Harte's Calculation Of $103,390 (Actually $88,310) In Damages For Nextel's Alleged Mismanagement of Cell Net Is Inadmissible As Unreliable. ................................................................ 8

    B.    Harte's Calculation Of $1.515 Million For Failure To Share Digital Revenues From Its iDEN System in 2002 and 2003 Is Inadmissible As Irrelevant To Any Remaining Claim. ................................. 11

    C.    Harte's Calculation Of $89,430 For Motorola Conversion Is Inadmissible As Irrelevant And Unreliable. ........................................ 11

    D.    Harte's Calculation Of $13,130,000 For Failure To Share Digital Revenues From Its iDEN System in 2004 and 2008 Is Inadmissible As Irrelevant To Any Remaining Claim. ................................................. 12

    E.    Harte's Calculation Of $14,740,060 (Actually, $42,762,066) For Nextel's Solicitation Of Toomey's Customers Is Inadmissible As Irrelevant And Unreliable. ........................................................... 13

Conclusion ............................................................. 15

# TABLE OF AUTHORITIES

**Page**

### CASES

In re Aluminum Phosphide Antitrust Litig.,
  893 F. Supp. 1497 (D. Kan. 1995) .................................................. 8

American Booksellers Ass'n v. Barnes & Noble, Inc.,
  135 F. Supp. 2d 1031 (N.D. Cal. 2001) .................................... 2, 12, 14

Blue Dane Simmental Corp. v. Am. Simmental Ass'n,
  178 F.3d 1035 (8th Cir. 1999) ..................................................... 10

Children's Broadcasting Corp. v. Walt Disney Co.,
  245 F.3d 1008 (8th Cir. 2001) ...................................................... 8

Craftsman Limousine, Inc. v. Ford Motor Co.,
  262 F.3d 761 (8th Cir. 2004) ....................................................... 8

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
  509 U.S. 579, 113 S. Ct. 2786 (1993) ...................................... 1, 4-6, 8

Edmonds v. Illinois Central Gulf Railroad Co.,
  910 F.2d 1284 (5th Cir. 1990) ..................................................... 4

Farley Transp. Co. v. Santa Fe Trail Transp. Co.,
  786 F.2d 1342 (9th Cir. 1985) ..................................................... 8

JRL Enter., Inc. v. Procorp Assoc., Inc.,
  2003 WL 21284020, *7 (E.D. La. June 3, 2003) .................................. 14

Kline v. Lorillard,
  878 F.2d 791 (4th Cir. 1989) ...................................................... 6

Kumho Tire Co. v. Carmichael,
  526 U.S. 137, 119 S. Ct. 1167 (1999) ...................................... 1, 4-6, 8

McGlinchy v. Shell Chem. Oil,
  845 F.2d 802 (9th Cir. 1988) ............................................. 2, 4, 8, 12, 14

MTX Communications Corp. v. LDDS/WorldCom, Inc.,
  132 F. Supp. 2d (S.D.N.Y. 2001) .................................................. 10

United States v. Chang,
  207 F.3d 1169 (9th Cir. 2000) .................................................. 5, 7

Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.,
  254 F.3d 706 (8th Cir. 2001) ...................................................... 6

Wilson v. Woods,
  163 F.3d 935 (5th Cir. 1999) ...................................................... 7

## TABLE OF AUTHORITIES
### (continued)

Page

**STATUTES**

Fed. R. Evid. 702 .................................................................. 4

**Preliminary Statement**

Plaintiff William Ameen Toomey, Jr. has served two damages reports with the identical title of "Initial Expert Report of Mr. Lawrence Harte." The first, served on June 1, 2004, contained no footnotes or any other indication as to the source of the data or information on which Harte relied. Harte's unsourced report did not comply with Rule 26(a)(2)(B)'s requirement that an expert report "contain a complete statement of all opinions to be expressed and <u>the</u> <u>basis</u> and reasons therefor" (emphasis added). Nextel's counsel objected to the report in a letter to Toomey's counsel. In response, Toomey served Harte's second "Initial" report on June 15, 2004, containing 21 cursory footnotes to support nearly $60 million in claimed damages.

More substantively, both "Initial" reports are littered with errors, including gross errors of simple math, such as adding alleged damages of $1.9 million, $4.5 million, $7.0 million, $7.2 million, $7.3 million, $7.3 million and $7.5 million to a sum of only $14.7 million, when the accurate sum is nearly $43 million, a miscalculation that is obvious upon simply scanning the page. That Harte filed a report with no citation to source data and obvious addition errors is understandable. Harte may be an expert in the electronics of cellular phone service, but he has no training or experience whatsoever that would allow him to do a reliable economic analysis of lost profits over a thirteen year period, a fact he directly conceded at deposition.

Harte's damages analysis is more substantively marred by obvious analytical lapses. For example, Harte readily admitted that he made no effort whatsoever to identify and hold constant variables (other than Nextel's presumed misconduct) that plainly affected the claimed damages he was attempting to measure, thereby rendering his damages calculation irrelevant and unreliable under black-letter law.

Accordingly, Nextel moves to exclude any of Harte's damages analysis on two bases: one, he is not qualified to offer expert testimony on economic damages; two, his individual damages calculations are inadmissible under <u>Daubert</u> and <u>Kumho</u> <u>Tire</u> as unreliable, irrelevant, or both. Moreover, in light of the Court's partial grant of summary judgment, three of the categories for which Harte calculates damages no longer are tethered to any actionable liability claim, and hence are inadmissible as irrelevant.

## Statement of Facts

### A.  Harte's Qualifications As An Expert

Harte received a B.S. in Electronics Technology in 1990, largely on the basis of junior college electronics courses and military courses he had taken during his years in the military, and an executive MBA five years later.[1] He is a specialist in wireless communications technology and has published on the subject. In addition, Harte has over twenty-nine years of experience in the communications industry. However, all of his experience and training is in the electronics, engineering, and managerial fields. Harte has never calculated damages as an expert in any prior retention, and he conceded that he does not have any formal education that would allow him to do so.[2] He specifically testified that he had no training that would allow him to create economic model to calculate damages in a "relevant and reliable way."[3] In fact, prior to being questioned at deposition, Harte had never even heard of the concept of a "but-for" world[4] -- the hypothetical world unaffected by the alleged illegal conduct, against which damages in the actual world allegedly caused by that conduct must be measured.[5]

---

[1] See Initial Expert Report of Lawrence Harte dated June 15, 2004 ("Harte Report"), at 42, attached as Exhibit A to the August 13, 2004 Declaration of Rachel M. Herrick ("Herrick Decl."). Harte's B.S. was awarded by an institution called the University of the State of New York, at which he apparently took no classes, instead being awarded the degree by receiving credit for an aggregation of classes in electronics he earned at various junior colleges during his military career. See Herrick Decl., Exh. B (excerpts from the deposition of Lawrence Harte) (hereinafter, "Harte Tr."), at 17:8 to 22:24.

[2] Harte Tr. at 6:22 to 7:5.

[3] Harte Tr. at 131:12 to 132:9 (Harte testified he had "no specific experience" in "model[ing] a damages model to make sure it's relevant and reliable").

[4] Harte Tr. at 105:23-25 (Harte cannot "remember" that he had "ever heard the concept [of a] 'but for' world before" being asked about it at the deposition.

[5] See McGlinchy v. Shell Chemical Co., 845 F.2d 802, 806-7 (9th Cir. 1988) (affirming exclusion of expert testimony where proffered expert attempted to forecast lost profits without demonstrating that market conditions were the same before and after the alleged injuries occurred); American Booksellers Ass'n v. Barnes & Noble, Inc., 135 F. Supp. 2d 1031, 1040 (N.D. Cal. 2001) (same).

B.  **Harte's Damages Calculations**

Harte's Report calculates five categories of damages, but does not provide a net total damages number, as follows:

1. damages of $103,390 for Nextel's alleged mismanagement and failure to market the Cell Net system (Report ¶¶ 143-146);

2. past damages of $1.515 million for Nextel's failure to share revenue from its digital iDEN network with Toomey in 2002 and 2003 (Report ¶¶ 147-161);

3. an obscure claim for $89,430 that Nextel does not understand, which is not based on anything alleged in the First Amended Complaint, and for which Harte could not identify any evidence at deposition, relating to Motorola customers (Report ¶¶ 163-166);

4. future damages of $13.130 million for Nextel's failure to share revenue from its digital iDEN network with Toomey in 2004-2008 (Report ¶¶ 167-175); and

5. a calculation showing Nextel allegedly gained "gross sales" shown as $14.740 million, but which actually is approximately $43 million, from its alleged solicitation of Toomey's customers, Report ¶ 178).

As we now show, Harte isn't qualified to offer any of these mathematical calculations (or miscalculations) as competent expert damages testimony, and each calculation is substantively flawed as unreliable, irrelevant, or both.

**Argument**

I.  **THE COURT'S GATEKEEPER FUNCTION AS TO EXPERT TESTIMONY UNDER *DAUBERT* AND *KUMHO TIRE*.**

Under Fed. R. Evid. 702, an expert must have "knowledge, skill, experience, training or education" pertaining to the issues that go beyond "subjective belief or unsupported speculation." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 588-90, 113 S. Ct. 2786, 2794-95 (1993). "Without more than credentials and a subjective opinion, an expert's

1  testimony that 'it is so' is not admissible." Edmonds v. Illinois Central Gulf Railroad Co.,
2  910 F.2d 1284, 1287 (5th Cir. 1990). "[I]f an opinion is fundamentally unsupported, then it
3  offers no expert assistance to the jury." Id. at 1287. Courts in the Ninth Circuit do not hesitate to
4  exclude expert testimony based on speculation. See, e.g., McGlinchy, 845 F.2d at 807.

Daubert and its progeny requires the district court to serve as "gatekeeper" in excluding expert testimony that fails to clear threshold hurdles of relevance and reliability. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 138, 119 S. Ct. 1167, 1169 (1999). Under Daubert, the district court must apply a three-part test: (i) Is the proffered expert qualified to testify based on his knowledge, skill, experience, training or education? (ii) Is the expert testimony based on scientific or specialized knowledge appropriately applied to the facts of the case — the reliability requirement? (iii) Will the testimony assist the trier of fact in understanding the evidence or determining a fact in issue — the relevance requirement? Daubert, 509 U.S. at 591-92. As set forth below, Harte's testimony does not pass any element of this test. Harte is unqualified to perform the damage calculations because he possesses no specific training or experience in the relevant field. His opinion is unreliable because he makes serious mathematical and conceptual errors, lacks citation to support his assumptions and relies on faulty methodology. Most of Harte's testimony is now irrelevant in any event because it pertains to claims already adjudicated in summary judgment.

## II. HARTE'S DAMAGES ANALYSIS ARE INADMISSIBLE BECAUSE HE IS NOT QUALIFIED TO PERFORM SUCH ANALYSIS.

In Daubert, the Court stated that expert scientific testimony must rest on a reliable foundation and must be relevant to the task at hand. See 509 U.S. at 580, 113 S. Ct. at 2790. Kumho Tire extended this requirement to all expert testimony. See 526 U.S. at 138, 119 S. Ct. at 1169. The federal circuits have interpreted the holdings to exclude proffered expert testimony if the designated expert lacked training in the specific area relevant to the case. In other words, the relevant question under the case law is not whether Harte is an expert in wireless communications technology, but whether he is expert in economic modeling, forecasting, but-for damages calculation and the like.

Motion to Exclude Plaintiff's Expert's Damages Testimony
Case No. C 03 2887 MMC (JL)                    -4-

In <u>United States v. Chang</u>, 207 F.3d 1169 (9th Cir. 2000), the court affirmed the exclusion by the trial court of expert testimony where a professor of clinical marketing testified as to the authenticity of an allegedly counterfeit Japanese bank certificate. <u>Id</u>. at 1171. The professor had neither formal training nor experience in identifying counterfeit foreign securities. <u>Id</u>. at 1172-73. Although the professor was an expert in international finance and was well-qualified to testify as to the underlying indicia of authenticity, the court concluded that he was unqualified to determine whether a particular security were counterfeit, the relevant issue of the case. <u>Id</u>.

Exclusion of Harte's proffered damages testimony follows <u>a fortiori</u> from <u>Chang</u>. The expertise of the excluded professor in <u>Chang</u> was far closer to the intended area of testimony than here. There, the professor <u>was</u> an expert in the actual indicia of authenticity, but had no expertise or training as to the authenticity of any particular security. Here, while Harte is presumably an expert in a variety of technical areas of wireless marketing, he has <u>no</u> training and <u>no</u> experience calculating economic damages in the wireless industry -- or any other industry. Harte's background as an engineer and business manager does not qualify him to perform these sorts of specialized expert analyses.

The closest Harte's experience come to allowing him to calculate damages -- and it is not close at all -- is his executive MBA from Wake Forest. An executive MBA program may teach someone skills as a business manager, but case law specifically has held that having an MBA does not qualify a witness to serve as an expert in economic analysis. In <u>Kline v. Lorillard</u>, 878 F.2d 791 (4th Cir. 1989), the plaintiff hired as an expert witness someone with an MBA to testify on the question of whether the plaintiff's shift in credit practices was an unjustified credit discrimination and price discrimination under the Robinson-Patman Act. <u>Id</u>. at 799. Although the witness possessed significant financial work experience, she had no specific training or experience in making credit decisions. <u>Id</u>. Moreover, her general business education did not include any training in the area of antitrust or credit, the specific issues in the case. <u>Id</u>. at 800. In short, her master's degree in business administration did not qualify her as an economist. <u>Id</u>. at 799.

Harte's training in business administration likewise did not prepare him to give expert testimony on the economics of cellular phone service. While Harte may be competent to manage a business or engineer wireless technology, plaintiff has presented no evidence whatsoever of his qualifications to conduct economic analyses. In fact, at deposition, Harte directly admitted that he had never heard of the threshold concept of a "but-for world," does not consider his damage calculations to be "but-for damage calculations" but rather "revenue calculations based on certain assumptions," has no "specific experience in calculating damages in a but-for world," and has no training in econometrics, advanced mathematics, or statistics that would enable him to model damages in a relevant, reliable way. See Harte Tr. 105:23-25, 107:11-15, 131:20-22, 131:23-132:9.

In applying the gatekeeper function of Daubert and Kumho Tire, the federal circuits have set a high bar for determining the "fit" between an expert's background and the particular issues on which the expert seeks to testify. In an action brought for breach of bailment contract for flood damage sustained to property stored in a warehouse, the court ruled that a Ph.D. hydrologist specializing in flood risk management "sorely lacked the education, employment, or other practical personal experiences to testify as an expert specifically regarding safe warehousing practices." Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 715 (8th Cir. 2001). Although the witness had published sixty-plus articles in flood risk management and had worked on such issues with entire communities and shopping centers, the fact that he lacked specific knowledge of warehousing led the court to exclude his testimony. Id. Similarly, in a negligence action involving a traffic collision, the court ruled that a witness holding a master of science degree in mechanical engineering with twenty-five years of work experience in fire reconstruction was unqualified to serve as an expert in accident reconstruction. Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999). The witness clearly possessed expertise in a closely related field and had even shifted his professional emphasis recently to automobile accident reconstruction. However, the court concluded that he was insufficiently qualified to testify as an expert due to his lack of specific training and experience in the core issue of the case. Id.

From this case law, two points emerge. First, Harte's proffered expert testimony should be excluded due to his lack of expertise, training or experience in the specific area of damages calculations. His qualifications in cellular phone technology and business administration are insufficient to demonstrate expertise in calculating damages based on economic analysis. Second, the fact that Harte patently lacks expert credentials in the calculation of economic damages terminates the discussion -- in other words, as in the Chang case, should the Court determine that Harte is not qualified to offer expert testimony on damages, the Court need not even go on to consider whether the specific calculations are also irrelevant or unreliable. The rationale for Chang's holding is clear: given Harte is not an expert in the specific field on which plaintiff designated him to offer expert testimony, plaintiff simply cannot provide any indicia of reliability of his non-expert mathematical calculations.

Nextel nonetheless shows below that Harte's specific calculations are patently unreliable and marred by just the kind of obvious calculational and methodological errors one would expect from a witness without any specialized training or experience in the area in which he has purported to offer expert testimony.

### III. EACH OF THE CATEGORIES OF DAMAGES THAT HARTE CALCULATED ARE INADMISSIBLE UNDER *DAUBERT* AND *KUMHO TIRE*.

#### A. Harte's Calculation Of $103,390 (Actually $88,310)[6] In Damages For Nextel's Alleged Mismanagement of Cell Net Is Inadmissible As Unreliable.

A "'before and after' assessment of damages" is an appropriate methodology for measuring lost profit damages only where the expert "confirm[s] that relevant market conditions were the same before and after the time the injury was alleged to have occurred." McGlinchy, 845 F.2d at 807. The goal of the expert in applying the methodology is to "determine the hypothetical or 'counter-factual' prices that would have prevailed" but for the allegedly illegal act.

---

[6] The correct figure is actually $88,310. Harte made a simple computational error in arriving at $103,390. On the second-to-last line of the table following ¶ 146 of the Harte Report, Harte improperly adds 9.08 and -42.55 to 75.69, calculating 57.29 instead of the true sum, 42.22. This error carries through to the final number.

1. In re Aluminum Phosphide Antitrust Litig., 893 F. Supp. 1497, 1503 (D. Kan. 1995). To that end, it is "fundamentally necessary to explain the pattern of forces outside the violation period using factors that might have changed (*i.e.*, supply, demand, and differences in competition)." Id. "[F]ailure to keep other things equal is one of the known pitfalls in the path of the serious economist" and is sufficient grounds to exclude the expert testimony. Id. at 1503, 1507; see also Children's Broadcasting Corp. v. Walt Disney Co., 245 F.3d 1008, 1018 (8th Cir. 2001) (trial court properly excluded expert who "failed to consider the effect of competition"); Craftsman Limousine, Inc. v. Ford Motor Co., 262 F.3d 761, 777 (8th Cir. 2004) (expert who "did not determine whether other factors, including the emergence of two direct competitors, may have affected [growth]" should have been excluded).

In sum, the expert must segregate between losses caused by lawful, exogenous factors (such as competition), and those caused by the defendant's allegedly illegal acts. Farley Transp. Co. v. Santa Fe Trail Transp. Co., 786 F.2d 1342, 1352 (9th Cir. 1985). It is not enough to merely assume that all lost profits are due to illegal activities, for such an assumption "does not provide a reasonable basis for the calculation of damages by the jury." Id. at 1351.

Harte miscalculated damages of $103,390 (the actual sum of the numbers shown is $88,310) based on Nextel's alleged mismanagement of the Cell Net system from 1995 to 2003. But Harte conceded that he made no attempt to account for other factors besides Nextel's alleged wrongful behavior which would have affected the number of Cell Net subscribers and the revenue they generated, despite an obvious list of such factors which Harte acknowledged could have had an appreciable impact.

To arrive at the $103,390 figure that he asserts is owed to Toomey by Nextel for mismanagement, Harte simply takes the peak revenue ever achieved by the Cell Net system, $2.61 million in 1995, and assumes that a properly managed system would have maintained that level of revenue through 2003.[7] See Harte Report, tables following ¶¶ 143, 145. When asked if

---

[7] Harte does not actually explain how he arrives at the constant $2.61 million figure, other than his statement that he assumes that a properly managed system would have remained
(continued...)

he were aware of any other factors besides mismanagement that might have affected Cell Net revenue, and if he had made any attempt to account for them, Harte admitted that he was aware of such factors, but had ignored them:

> Q. Now, you're aware that there's other things that could have affected the number of subscribers on CellNet, correct?
>
> A. Yes.
>
> Q. The emergence of competitive technology, right?
>
> A. Yes.
>
> Q. Or competitive service. The overall economic climate, growth in the Bay Area.
>
> A. Uh-huh.
>
> Q. Did you try -- did you do any steps to attempt to identify significant variables that also could have affected the number of CellNet subscribers and in some way attempt to hold them constant?
>
> A. No.

Harte Tr. 185:25-186:15.

This total failure to consider alternative causes of Cell Net's decline is, by itself, sufficient grounds to exclude the damages claim as unreliable.[8] Moreover, there is every reason to believe that had Harte done a methodically competent analysis, and actually tried to identify and hold constant other variables affecting the level of Cell Net's subscribers and revenues, he would readily have identified other factors causing subscribers to leave and revenues to fall. For

---

[7] (...continued)
fully-loaded at 9000 customers through 2003, Harte Report ¶ 142, the maximum capacity of the network as reported by Nextel in 1996, Harte Report ¶ 140. But because Harte then goes on simply to use Nextel's 1995 "declared revenue" of $2.61 million as the "managed revenue" that Nextel should have achieved every year, he also implicitly assumes that the average per-customer monthly revenue should have remained constant at about $24.17 (2,610,000 ÷ 12 ÷ 9000).

[8] See Blue Dane Simmental Corp. v. Am. Simmental Ass'n, 178 F.3d 1035, 1040-41 (8th Cir. 1999) (finding expert was properly excluded for failing to consider, identify, and evaluate all independent variables significantly affecting market changes); MTX Communications Corp. v. LDDS/WorldCom, Inc., 132 F. Supp. 2d (S.D.N.Y. 2001) (excluding expert's testimony for omitting major variables, including economic downturns, and "consider[ing] a company's lifeline in a vacuum").

1  example, Harte acknowledged that the iDEN system, a competing digital service that Nextel
2  introduced in the Bay Area in 1995, was, relative to Cell Net, a superior service "in most aspects"
3  for "a majority of consumers" and that it would be "a fair assumption" that some percentage of
4  Cell Net subscribers would chose iDEN over Cell Net because it was a superior product for most
5  consumers and most applications.  See Harte Tr., 35:20-24, 37:11-15, 39:17-24.  In short, Harte
6  has completely ignored an obvious alternative explanation for the decline in Cell Net revenues --
7  competition from a new, superior digital service -- and failed to control for other obvious
8  potential factors such as the effects of the dot.bomb on the Bay Area economy.[9]

9  In sum, Harte's miscalculation of $103,390 (actually $88,310) in damages for
10 Nextel's alleged mismanagement of Cell Net makes no attempt to account for changes in relevant
11 market conditions that would likely have impacted what he was attempting to measure.
12 Accordingly, the calculation is irrelevant and unreliable, and should be excluded because it
13 would not assist a jury to determine the fact or amount of Toomey's damages.

14 **B.    Harte's Calculation Of $1.515 Million For Failure To Share Digital Revenues**
15 **From Its iDEN System in 2002 and 2003 Is Inadmissible As Irrelevant To**
16 **Any Remaining Claim.**

17 In the Court's July 27, 2004 Order Granting in Part and Denying in Part
18 Defendant's Motion for Summary Judgment ("Order"), the Court ruled "Nextel has no duty under
19 the 1988 Agreement to share with Toomey revenues from Nextel's 900 MHz digital service."
20 Order at 18:10-11; see also Order at 28:27 (same).  Accordingly, Harte's damages calculation for
21 damages Toomey allegedly suffered due to Nextel's failure to share digital revenues in 2002 and

---

[9] In addition, the theory underlying Harte's damage calculation for mismanagement is premised partly on assertions that Nextel engaged in a plan to deliberately migrate Cell Net customers to iDEN.  Harte Report, ¶ 141.  The Court, however, ruled in its July 27, 2004 Order (at 22:6 to 24:16-17) that Toomey's claims that Nextel improperly solicited his customers from Cell Net onto iDEN is time-barred.  There is no way to disaggregate damages allegedly suffered under this time-barred theory from those caused by other forms of mismanagement.

1  2003, as set forth at paragraphs 147-162 of the Harte Report, is inadmissible as it is irrelevant to
2  any remaining issue in the case.[10]

### C. Harte's Calculation Of $89,430 For Motorola Conversion Is Inadmissible As Irrelevant And Unreliable.

Beginning with paragraph 163 in his report, Harte attempts to calculate Toomey's share of revenue that he alleges Nextel acquired in a secret deal with Motorola and did not report to Toomey. This calculation is both irrelevant and unreliable.

First, the calculations are irrelevant and unreliable because they are based on assumptions for which plaintiff has identified no evidence and as to which the First Amended Complaint is silent.[11] The basis of these damages is Harte's assertions that, in 1995, "Motorola gave up 40 of it's [sic] own 900 MHz channels and put 2600 customers on the CellNet system by converting 24 of the E.F. Johnson radio channels to Motorola format," and that "[i]t appears that Toomey was not compensated for these." Harte Report, ¶ 164. In support of these assertions Harte cites only to documents bearing the control numbers NC1230-82. But when asked at deposition what evidence in those documents or from any other source supported his assertion, Harte could identify nothing beyond language indicating that twenty-four of Cell Net's E.F. Johnson channels would be converted to Motorola format. Harte Tr. at 169:10-22. Harte could point to nothing indicating that <u>Motorola</u> had given up any channels -- that is, Harte had seen nothing indicating that Motorola had lost <u>any</u> customers, the essential predicate of this claim. See Harte Tr. at 170:1 to 171:3. Harte also admitted that he had seen no evidence that revenue from these (phantom) Motorola customers was not shared with Toomey:

---

[10] In addition, the Court found that Nextel and Toomey had modified the 1988 Agreement in 1998 and again in January 1999 to abandon the revenue sharing formula in the agreement in lieu of a fixed monthly payment of first $5000 and then $7500 per month. See Order at 20:18-26. Hence, any "damages" after the modifications are limited, at most, to $7500 per month, a factor that Harte nowhere addresses in his calculation of millions of dollars in claimed post-1998 damages.

[11] The Motorola claim is nowhere mentioned in the complaint, first amended complaint or in Toomey's deposition testimony. The first Nextel heard about it was the conclusory discussion of it in the Harte Report.

> Q. Now, what evidence, if any, do you have for the assumption that, of those customers who went onto CellNet, that they weren't just treated as regular old CellNet customer and Mr. Toomey's check started to go up in 1996 and Mr. Toomey was happily receiving money in 1996? What evidence that we kind of hit on?
>
> A. I don't have evidence that it happened. I have no evidence. . . .

Harte Tr. 171:4-11. Rather, the basis of Harte's assertion was his being told to assume it by counsel for Toomey. Id. at 173:6-13. Because Harte cannot "back up his opinion with specific facts," his testimony as to Motorola conversion damages must be excluded. McGlinchy, 845 F.2d at 806. As it stands, his conclusions rest on unsupported assumptions "entirely too speculative to support a jury verdict." American Booksellers, 135 F. Supp. 2d at 1042.

Second, the calculations are irrelevant and unreliable because they are inconsistent with Toomey's alleged mismanagement damages. In arriving at the $103,390 damages figure for mismanagement discussed above, Harte assumed that a properly managed Cell Net system would have remained at full capacity with 9000 subscribers. Harte Report ¶¶ 140, 143. Thus, in Harte's but-for world, Cell Net could not have taken on an additional 2600 customers; it would have been already operating at capacity and there simply would have been no space for the additional phantom 2600 Motorola customers.

D. **Harte's Calculation Of $13,130,000 For Failure To Share Digital Revenues From Its iDEN System in 2004 and 2008 Is Inadmissible As Irrelevant To Any Remaining Claim.**

As stated above, the Court has ruled "Nextel has no duty under the 1988 Agreement to share with Toomey revenues from Nextel's 900 MHz digital service." Order at 18. Accordingly, Harte's damages calculation for damages Toomey allegedly suffered due to Nextel's failure to share future digital revenues from 2004 through 2008, as shown in paragraphs 167-176, is inadmissible as it is irrelevant to any remaining issue in the case.[12]

---

[12] As noted in n.10 above, the Court also ruled as a matter of law that the parties modified in the 1988 Agreement in May 1998 and January 1999 to change the revenue sharing formula to a fixed monthly payment. Hence, all post-January 1999 damages claims are limited to any non-payment of the fixed monthly fees of $7500 per month.

E. **Harte's Calculation Of $14,740,060 (Actually, $42,762,066)[13] For Nextel's Solicitation Of Toomey's Customers Is Inadmissible As Irrelevant And Unreliable.**

Harte's miscalculation of "gross revenue gain" of $14,740,060 (the numbers shown actually sum to $42,762,066) that Nextel allegedly gained through solicitation of Toomey's customers is inadmissible for four independent reasons.

First -- and dispositively -- the Court ruled in its July 27, 2004 Order that Toomey's claim that Nextel improperly solicited his customers from Cell Net onto iDEN are time-barred. See Order at 22:5 to 24:17. Harte's calculation of "gross revenue gain" which Nextel allegedly realized by "converting existing [Cell Net] customers to iDEN," Harte Report ¶ 178, is based solely upon a theory of "Nextel's solicitation and 'migration' plan," id. at ¶ 177. The calculation is therefore unrelated to any remaining liability claim and is inadmissible as irrelevant.

Second, Harte's calculation rests on unsupported and unrealistic assumptions. It is premised on the absurd idea that all 9027 customers on Cell Net in 1996 were switched to iDEN by 2003, and that Nextel thereby experienced a continuing revenue gain on each and every lost Cell Net customer. See Harte Tr. at 141:6-12. Harte himself recognized that this is an unrealistic assumption, and that some of Cell Net's lost customers would have ceased using wireless devices altogether, or would have been lost to competing SMR, cellular, or PCS services, rather than uniquely and permanently switching to Nextel's iDEN. See Harte Tr. at 141:14 to 142:6. Harte offers no justification for his assumption that iDEN could so perfectly capture the Cell Net market, and he cannot so maintain because it would fly in the face of his own testimony that customers would have left Cell Net for numerous reasons. Harte's testimony must be excluded because it relies upon unsupported, speculative, and counter-factual assumptions. See American Booksellers, 135 F. Supp. 2d at 1041-1042; McGlinchy, 845 F.2d at 807; JRL Enter., Inc. v. Procorp Assoc., Inc., 2003 WL 21284020, *7 (E.D. La. June 3, 2003) (excluding testimony as

---

[13] Harte acknowledged that there is a computational error in his table and that the annual damages should instead sum to $42,762,066. Harte Tr. 34:6 to 35:19.

nothing more than "an exercise in arithmetic on unreliable values," where expert's numbers had no basis in reality).

Third, Harte's calculation dramatically overstates Nextel's revenue gain as against Toomey. He purports to calculate the revenue gain resulting from the conversion of "Toomey's customers," Harte Report ¶ 178, but utterly fails to account for the fact that Toomey only owned ten of the ninety Cell Net 900 MHz channels from which the customers were allegedly wrongfully solicited. Thus, Toomey's share of customers and revenue allegedly migrated to iDEN is at most one ninth of the total, and this alone reduces Harte's result by a factor of nine. Harte acknowledged this at deposition:

> Q. But is there any reason, any business reason, any technical reason, any reason you can think of on any area you have expertise why it isn't obvious that this number also has to be multiplied by Mr. Toomey's percentage of channels versus total channels? . . . [I]n terms of trying to estimate Nextel's allegedly improper revenue gain from the wrongful misappropriation of CellNet customers.
>
> A. Aside from additional direction I may be given by counsel . . . I don't see any business reason why the ratio would not apply. So you are correct.

Harte Tr. at 293:2-15. Harte's revenue calculations are therefore misleading and irrelevant, and should be excluded on this basis as well.

Fourth, although Harte labels his calculation as "gross revenue <u>gain</u>," he does not subtract out revenue that Nextel lost as a result of allegedly migrating customers away from Cell Net to its iDEN system. Gross revenue <u>gain</u> is the difference between revenue Nextel earned from these customers as iDEN subscribers and what Nextel would have earned from them as Cell Net subscribers. Harte attempts to calculate the first number, but ignores the second. Therefore, Harte's result does not represent a "gain" at all, and his calculation of "revenue gain" is irrelevant and unreliable.

For each of these reasons, Harte's testimony as to Nextel's "gross revenue gain" should be excluded as irrelevant and unreliable.

## Conclusion

For all of the foregoing reasons, Nextel respectfully requests that the Court grant its motion to exclude the damages testimony of Lawrence Harte in its entirety.

DATED: August 13, 2004

                        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

                        By   /s/ Dominic Surprenant
                             Dominic Surprenant
                             Attorneys for Defendant
                             NEXTEL COMMUNICATIONS, INC.